STATE OF MICHIGAN
COURT OF APPEALS

CONNIE JOUGHIN,

        Plaintiff-Appellee,

v

WILLIAM JOUGHIN,

        Defendant-Appellant.

FOR PUBLICATION
July 11, 2017

No. 329993
Lenawee Circuit Court
Family Division
LC No. 02-025414-DM

Before: HOEKSTRA, P.J., and JANSEN and SAAD, JJ.

JANSEN, J. (*dissenting*).

Because I believe that entry of a QDRO is an action to enforce a judgment of divorce and subject to the applicable statute of limitations, I respectfully dissent.

This Court has held that MCL 600.5809 provides the applicable statute of limitations for the enforcement of a divorce settlement agreement. See *Peabody v DiMeglio*, 306 Mich App 397, 406; 856 NW2d 245 (2014) (holding that MCL 600.5809(3)'s 10-year statute of limitations applied to a divorce settlement agreement that was incorporated by reference into a divorce judgment). As noted by the majority, both parties agree that MCL 600.5809 provides the statute of limitations applicable in this matter. The parties dispute only the date upon which plaintiff's "claim" to her share of defendant's retirement funds under the judgment of divorce accrues for purposes of MCL 600.5809. Plaintiff asks this Court to determine that her claim to defendant's annuity funds will not accrue for purposes of MCL 600.5809 until defendant retires and she is able to receive benefits pursuant to his policy. Defendant argues to the contrary, insisting that plaintiff's claim accrued when the judgment of divorce entered on April 28, 2003.

This is a matter of first impression in this state. However, a number of our sister states have addressed the situation now before us. A review of their opinions reveals three distinct outcomes. First, courts in New York have adopted the reasoning advanced by plaintiff in this case, holding in *Duhamel v Duhamel*, 188 Misc 2d 754, 756; 729 NYS2d 601 (2001), that "the limitations period relating to the Defendant's action seeking to preclude the entry of a QDRO, and thus subjecting Defendant's retirement benefits to equitable distribution, accrued after he reached pay status in the retirement benefits." The *Duhamel* Court provided little in the way of reasoning, but reiterated that "since Plaintiff's right to receive a distribution under the Defendant's retirement plan did not accrue until after her former husband reached pay status, the

six-year limitation period [applicable in New York] did not begin to run until his retirement date." *Id.*

The *Duhamel* Court's adopted outcome is fraught with possible procedural complications. Adoption of the *Duhamel* rule would require our courts to employ a different statute of limitations in each case involving an action to enforce an award of retirement benefits found in a judgment of divorce. This is because the date upon which a defendant may reach "pay status" for purposes of a QDRO varies widely from plan to plan. For example, an alternate payee's right to early withdrawal may depend on whether the plan is a defined contribution plan or a defined benefit plan. Under some plans, an alternate payee may be entitled to a lump sum payment upon entry of the QDRO, or to an immediate transfer into the alternate payee's own retirement account. As the United States Department of Labor (the Department) explains in its 2014 handbook, *QDROs: The Division of Retirement Benefits Through Qualified Domestic Relations Orders*, (2014), pp 32-33:

> Understanding the type of retirement plan is important because the order cannot be a QDRO unless its assignment of rights or division of retirement benefits complies with the terms of the plan. Parties drafting a QDRO should read the plan's summary plan description and other plan documents to understand what retirement benefits are provided under the plan.
>
> Retirement plans may be divided generally into two types: defined benefit plans and defined contribution plans.
>
> A defined benefit plan promises to pay each participant a specific benefit at retirement. This basic retirement benefit is usually based on a formula that takes into account factors like the number of years a participant works for the employer and the participant's salary. . . .
>
> *Defined benefit plans may promise to pay benefits at various times, under certain circumstances, or in alternative forms.* Benefits paid at those times or in those forms may have a greater actuarial value than the basic retirement benefit payable by the plan at the participant's normal retirement age. . . .
>
> A defined contribution plan, by contrast, is a type of retirement plan that provides for an individual account for each participant. The participant's benefits are based solely on the amount contributed to the participant's account and any income, expenses, gains or losses, and any forfeitures of accounts of other participants that may be allocated to such participant's account. . . . *Defined contribution plans commonly provide for retirement benefits to be paid in the form of a lump sum payment of the participant's entire account balance.* Defined contribution plans by their nature do not offer subsidies.
>
> *It should be noted, however, that some defined benefit plans provide for lump sum payments, and some defined contribution plans provide for annuities.* [Citation omitted, emphasis added.]

Although the benefits awarded in a judgment of divorce must be consistent with the planholder's rights under his particular plan, drafters of a QDRO have wide discretion in determining how benefits are received. See 29 USC 1056(d)(3)(C)(i)-(iv) (setting forth the requirements for entry of a QDRO, which include specifying the amount and manner of payments to be received as well as the number of payments requested); 29 USC 1056(d)(3)(D)(i)-(iii) (setting forth limitations on acceptable QDROs and explaining that a QDRO may not "require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan," or "require the plan to provide increased benefits.") A QDRO may adopt a "separate interest" approach, a "shared payment" approach, or some combination of the two. *QDROs*, pp 36-38.

> Orders that provide the alternate payee with a separate interest, either by assigning to the alternate payee a percentage or a dollar amount of the account balance as of a certain date, often also provide that the separate interest will be held in a separate account under the plan with respect to which the alternate payee is entitled to exercise the rights of a participant. [*QDROs*, p 36.]

Under a "shared payment" approach, an alternate payee typically receives a set percentage of payments received by the planholder pursuant to the plan. *QDROs*, p 36.

The limits on when and in what form an alternative payee may receive benefits pursuant to a retirement plan are as varied as the plans themselves:

> [A] QDRO may . . . give the alternate payee the right that the participant would have had under the plan to elect the form of benefit payment. For example, if a participant would have the right to elect a life annuity, the alternate payee may exercise that right and choose to have the assigned benefit paid over the alternate payee's life. However, the QDRO must permit the plan to determine the amount payable to the alternate payee under any form of payment in a manner that does not require the plan to pay increased benefits (determined on an actuarial basis).
>
> A plan may by its own terms provide alternate payees with additional types or forms of benefit, or options, not otherwise provided to participants, such as a lump-sum payment option, but the plan cannot prevent a QDRO from assigning to an alternate payee any type or form of benefit, or option, provided generally under the plan to the participant. [*QDROs*, p 39; citing 29 USC 1056 (d)(3)(A), (d)(3)(D), (d)(3)(E)(i)(III).]

I believe it is important to note that our record in this case is inadequate to support a determination of when plaintiff was first entitled to payment of benefits under the terms of defendant's annuity plan. However, defendant contends that plaintiff could have received payment pursuant to the terms of the annuity as early as the judgment of divorce. Were we to accept plaintiff's argument and adopt the *Duhamel* rule, it would be necessary for us to remand this case to the trial court for a determination of whether and when plaintiff's claim for payment of benefits under the annuity actually "accrued." If, pursuant to the terms of defendant's annuity plan, plaintiff was entitled to early payment or transfer of funds upon entry of the judgment of divorce, her claim would still be barred by the 10-year statute of limitations under *Duhamel*.

I believe the *Duhamel* rule erroneously conflates the right to entry of a QDRO pursuant to the judgment of divorce with the right to payment of benefits granted by an approved QDRO. Typically, a claim accrues "at the time the wrong upon which the claim is based was done regardless of the time when damage results." MCL 600.5827. The *Duhamel* Court, and now plaintiff on appeal, seemingly rely on this maxim in support of their proposed outcome, assuming that a plaintiff can suffer no "wrong" until he or she is denied the payment of benefits under a retirement plan. By way of example, plaintiff contends that her attempt to enter a QDRO is analogous to an action to enforce a payment of alimony or child support. In *Torakis v Torakis*, 194 Mich App 201, 203; 486 NW2d 107 (1992), this Court explained that the 10-year statute of limitations under MCL 600.5809(3) begins to run against each alimony installment when that installment becomes due. However, entry of a QDRO is easily distinguishable. Where monthly alimony and child support payments are due, a recipient has no right of enforcement until the installment payment has come due and gone unpaid. A plaintiff's right to entry of a QDRO is different. A plaintiff can suffer such wrongs as a refusal by the other party to cooperate in the pursuit of a QDRO or a plan administrator's denial of a QDRO, immediately upon entry of the judgment of divorce. A plaintiff is entitled to entry of a QDRO at any time after the entry of the judgment of divorce to secure her *interest* in the annuity plan, not her payment of benefits, and a plaintiff is not required to wait for a specific event prior to seeking enforcement of that term of the judgment of divorce. Therefore, plaintiff's "claim" under MCL 600.5809(1) accrued when she became entitled to initiate proceedings to secure her right to enter a QDRO. Once a QDRO is entered, a new right of enforcement arises for violations of the terms of the QDRO. A claim under this *new* right accrues when benefits are available and payment is denied.

This distinction between a plaintiff's right of enforcement and a plaintiff's right to receive money, the second possible solution for the issue presented, was considered and adopted by the Kansas Court of Appeals in *Larimore v Larimore*, 52 Kan App 2d 31; 362 P3d 843 (Kan App, 2015). [1] The circumstances presented in *Larimore* are nearly identical to the circumstances

---

[1] Similarly, the United States Bankruptcy Court for the Northern District of Ohio recently distinguished an alternate payee's rights under a domestic relations order from the alternate payee's rights under a QDRO:

> A domestic relations order is a sufficient independent basis for a spouse to obtain a vested beneficial interest in an ERISA-qualified plan. A person awarded a lump-sum distribution from an ERISA plan pursuant to a divorce decree has a direct interest in plan funds while the plan reviews the DRO to determine whether it constitutes a QDRO. A domestic relations order, therefore, vests the spouse with rights protected by ERISA. The QDRO, by contrast, is necessary to take the next step of transferring the assets into the spouse's name in her own qualified plan or individual retirement account. . . .
>
> For this reason, regardless of other facts or circumstances, *the Debtor in this case became an ERISA-qualified beneficiary of the Plan no later than January 8, 2015, when the State Court entered its Judgment Entry, which constitutes a domestic relations order directing the equal division of the Plan assets that are marital*

presented here. The *Larimore* plaintiff sought an order compelling the defendant, the plaintiff's ex-husband, to cooperate in the preparation and execution of a QDRO 12 years after the parties' judgment of divorce entered. The *Larimore* Court held that "the judgment dividing [the defendant's] retirement accounts had become absolutely extinguished and unenforceable due to [the plaintiff's] failure to file a QDRO or a renewal affidavit" within the applicable statute of limitations. *Larimore*, 52 Kan App 2d at 44. The *Larimore* Court explained:

> A former spouse's right to receive pension benefits deemed marital property, however, does not arise under ERISA. That right or interest is based on a state court judgment ordered under state domestic relations law. Indeed, a "QDRO only renders enforceable an already-existing interest." " '[T]he QDRO provisions of ERISA do not suggest that [the alternate payee] has no interest in the plan [ ] until she obtains a QDRO, they merely prevent her from enforcing that interest until the QDRO is obtained.' " As a result, in this case, while federal law did not provide a statute of limitation for the filing of a QDRO, [the plaintiff] could only obtain a QDRO if she had a valid right or interest created under Kansas domestic relations law to enforce. [*Id*. at 39 (citations omitted).]

The Kansas court then determined that the plaintiff no longer had a right to enforce the domestic order:

> Although the divorce decree established [the plaintiff's] right to receive a portion of [the defendant's] retirement accounts, ERISA's anti-alienation provision preempts the divorce court's DRO because it does not comply with ERISA's requirements for QDROs. As a consequence, [the plaintiff] was required to execute upon the judgment by filing a QDRO in order to enforce her right to receive benefits under [the defendant's] retirement accounts. [*Id*. at 41.]

The Court reasoned that the plaintiff's 12-year delay in bringing an action for entry of a QDRO "left her without a judgment to enforce." *Id*. at 42. Ultimately, the *Larimore* Court concluded:

> Upon a plain reading of the dormancy statute, we hold that [the statute] does not toll the running of the dormancy period for a judgment in a divorce decree which divides retirement plans governed by ERISA. We arrive at this conclusion because the legal process for enforcing such a judgment—the filing of a QDRO— is not stayed or prohibited until the benefits become payable. On the contrary, the filing of a QDRO is mandatory if the alternative beneficiary is to enforce his or her judgment. Although [the plaintiff] may not have been able to receive money from [the defendant's] retirement accounts during the ensuing 12 years, the necessary legal process—a QDRO—for enforcing [the plaintiff's] interest in the retirement accounts was fully available to her. [*Id*.]

---

*property of the Debtor and her ex-husband*. [*In re Lawson*, ___ BR ___, ___ (Bankr ND Ohio, 2017), slip op at 6 (quotation marks and citations omitted, emphasis added).]

For the reasons discussed, I find the *Larimore* Court's outcome highly persuasive, and consistent with the goals of efficiency and common sense application.

However, it is the third outcome offered by our sister courts that is set forth and adopted by the majority here. Courts in states such as Tennessee and Indiana have avoided the question of claim accrual for purposes of the statute of limitations by holding that entry of a proposed QDRO is simply not an action to enforce a noncontractual money obligation. See e.g. *Ryan v Janovsky*, 999 NE2d 895, 898 (Ind App, 2013) ("[The plaintiff's] right to part of [the defendant's] pension benefits arises from the settlement agreement; the QDRO only creates her right to be paid directly from the pension plan. And neither of these rights is yet enforceable because [the defendant's] pension benefits are not yet payable to anyone."); *Jordan*, 147 SW3d at 262 ("[T]he approval of the proposed QDRO is adjunct to the entry of the judgment of divorce and not an attempt to 'enforce' the judgment."). In *Jordan*, on which the majority relies, the Tennessee court explained that "[u]ntil the proposed QDRO is approved by the plan administrator and entered by the trial court, the act of the trial court in dividing the pension plan *is not complete and hence not enforceable.* It can be accurately described as inchoate in nature." *Jordan*, 147 SW3d at 263.

I am not persuaded that this Court should adopt the Tennessee Court's reasoning. It is true that an alternate payee only becomes entitled to rights under an ERISA-covered plan when a plan administrator approves the QDRO. But it is the right *to entry of a proposed QDRO* that is at issue here. As previously discussed, a party to a judgment of divorce can enforce his or her right to entry of a QDRO even before he or she is entitled to payment of benefits under a retirement plan. Such a right is not properly described as "inchoate." Rather, the right indisputably arises on entry of the judgment of divorce, to which the 10-year statute of limitations applies.

In adopting *Jordan*'s outcome, the majority circumvents the application of MCL 600.5809 in cases requiring a QDRO and, by extension, any other "ministerial task done in conjunction with the divorce judgment itself." Parties to a divorce judgment in Michigan are now given an unlimited amount of time to obtain entry of a QDRO. This outcome neglects the purpose of statutes of limitations. As our Supreme Court stated in *Lothian v Detroit*, 414 Mich 160, 166-167; 324 NW2d 9 (1982):

> Limitation periods created by statute are grounded in a number of worthy policy considerations. They encourage the prompt recovery of damages, they penalize plaintiffs who have not been industrious in pursuing their claims, they "afford security against stale demands when the circumstances would be unfavorable to a just examination and decision," they prevent fraudulent claims from being asserted, and they " 'remedy . . . the general inconvenience resulting from delay in the assertion of a legal right which it is practicable to assert.' " [Citations omitted.]

Despite the majority's assertion to the contrary, these considerations are not irrelevant in situations involving delayed entry of a QDRO.

The passage of time may substantially affect the parties' situations and the availability of funds under a retirement plan. While the rights of an alternate payee under a QDRO are

protected in the event of plan amendments, mergers, or sponsor changes, 29 USC 1056(d)(3)(A), an alternate payee has no such rights before entry of a QDRO. A planholder may pass away, leaving no beneficiary or a beneficiary other than the prospective alternate payee, or the planholder's retirement plan may be terminated. Although the Department recommends that, in these situations, "a QDRO must be taken into account in the termination of a plan as if the terms of the QDRO were part of the plan," a plan administrator would have no knowledge of a plaintiff's rights under a judgment of divorce before a QDRO is in place. *QDROs*, p 25. A plan administrator's review of a proposed QDRO can itself take more than 18 months, and can be denied several times before it is ultimately accepted. 29 USC 1056(d)(3)(H); *QDROs*, pp 20-22. If a QDRO is not entered and approved within 18 months after the first payment is due under a plan, "the plan administrator must pay out the segregated amounts to the person or persons who would have been entitled to such amounts if there had been no order," and even if the QDRO is later accepted, it will apply only prospectively. *QDROs*, p 22, citing 29 USC 1056(d)(3)(H). It is clear that both parties, as well as the general goal of efficient administration of payments under a retirement plan, benefit from the protections of a timely entered QDRO. Further, there is no unnecessary prejudice in the imposition of a 10-year statute of limitations on parties seeking entry of a QDRO. The statute of limitations should therefore apply.

It is worth noting that in this case, entry of the QDRO was itself ordered per the terms of the judgment of divorce, and should therefore not be considered a "ministerial task" left to completion at the parties' discretion. The judgment of divorce specifically ordered plaintiff and defendant to "cooperate in the execution of a [QDRO] to transfer said interest to the Plaintiff," and "execute whatever documents may be necessary to complete the transfer." Plaintiff could have moved at any time after the entry of the judgment of divorce to enter a QDRO to transfer her interest in the annuity plan, and if defendant refused to cooperate she could have sought relief from the trial court. However, plaintiff did not attempt to enforce the entry of a QDRO until 12 years after the judgment of divorce had been entered.

For the above reasons, I would adopt the reasoning set forth in *Larimore*, 52 Kan App 2d at 41-42, and hold that plaintiff's attempt to obtain entry of the QDRO 12 years after entry of the judgment of divorce was barred by the statute of limitations.

/s/ Kathleen Jansen